# STATE OF MICHIGAN

# COURT OF APPEALS

JACKSON THOMAS, a Minor, by HOWARD T.
LINDEN, Conservator,

       Plaintiff-Appellant,

v

OAKWOOD HEALTHCARE, INC., doing
business as OAKWOOD SOUTHSHORE
MEDICAL CENTER,

       Defendant-Appellee,

and

MARGARET JASKOWSKI-LUTSIC, D.O., and
MARGARET A. LUTSIC, D.O., P.C.,

       Defendants,

and

ALICE SHANAVER, D.O.,

       Intervening Defendant.

UNPUBLISHED
September 27, 2016

No. 326072
Wayne Circuit Court
LC No. 11-006027-NH

Before: MURPHY, P.J., and SAAD and BORRELLO, JJ.

PER CURIAM.

This medical malpractice lawsuit stems, in part, from a procedure performed by intervening defendant Dr. Alice Shanaver on plaintiff shortly after his birth on December 26, 2006. Plaintiff appeals the order granting partial summary disposition in favor of defendant Oakwood Healthcare, Inc., d/b/a Oakwood Southshore Medical Center (the hospital), with respect to plaintiff's claim of vicarious liability brought against the hospital on the basis of Dr. Shanaver's alleged malpractice in performing the procedure. The trial court ruled, as a matter of law, that neither an actual nor an ostensible agency relationship existed between the hospital and Dr. Shanaver for purposes of summary disposition under MCR 2.116(C)(10). We hold that there exists a genuine issue of material fact, when viewing the documentary evidence in a light most

-1-

favorable to plaintiff, regarding whether Dr. Shanaver was an actual agent of the hospital relative to the procedure at issue. Accordingly, we reverse and remand for further proceedings.

This Court reviews de novo a trial court's decision on a motion for summary disposition, *Loweke v Ann Arbor Ceiling & Partition Co, LLC*, 489 Mich 157, 162; 809 NW2d 553 (2011), the interpretation and legal effect of a contract, *Rory v Continental Ins Co*, 473 Mich 457, 464; 703 NW2d 23 (2005), and questions of law in general, *Oakland Co Bd of Co Rd Comm'rs v Mich Prop & Cas Guaranty Ass'n*, 456 Mich 590, 610; 575 NW2d 751 (1998). With respect to a motion for summary disposition brought pursuant to MCR 2.116(C)(10), this Court in *Pioneer State Mut Ins Co v Dells*, 301 Mich App 368, 377; 836 NW2d 257 (2013), recited the following well-established principles:

> In general, MCR 2.116(C)(10) provides for summary disposition when there is no genuine issue regarding any material fact and the moving party is entitled to judgment or partial judgment as a matter of law. A motion brought under MCR 2.116(C)(10) tests the factual support for a party's claim. A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. The trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10). A court may only consider substantively admissible evidence actually proffered relative to a motion for summary disposition under MCR 2.116(C)(10). [Citations and quotation marks omitted.]

"In ascertaining the meaning of a contract, we give the words used in the contract their plain and ordinary meaning that would be apparent to a reader of the instrument." *Rory*, 473 Mich at 464. "If the language of [a] contract is unambiguous, we construe and enforce the contract as written." *Quality Prod & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 375; 666 NW2d 251 (2003). A contract is ambiguous if its provisions are capable of conflicting interpretations. *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 467; 663 NW2d 447 (2003). If the contract language is ambiguous, "the ambiguous language presents a question of fact to be decided by a jury." *Cole v Auto-Owners Ins Co,* 272 Mich App 50, 53; 723 NW2d 922 (2006).

In *Cox v Flint Bd of Hosp Managers*, 467 Mich 1, 10-11; 651 NW2d 356 (2002), our Supreme Court observed:

> The plaintiff in a medical malpractice action bears the burden of proving: (1) the applicable standard of care, (2) breach of that standard by defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury. Failure to prove any one of these elements is fatal. Crucial to any medical malpractice claim is whether it is alleged that the negligence occurred within the course of a professional relationship. A hospital may be 1) directly liable for

malpractice, through claims of negligence in supervision of staff physicians as well as selection and retention of medical staff, or 2) *vicariously liable for the negligence of its agents.* Here, plaintiffs have not advanced claims of direct negligence on the part of defendant hospital. Therefore, defendant's liability must rest on a theory of vicarious liability.

Vicarious liability is indirect responsibility imposed by operation of law. [Citations and quotation marks omitted; emphasis added.]

"[A] hospital may be vicariously liable for the malpractice of actual or apparent agents." *Chapa v St Mary's Hosp of Saginaw*, 192 Mich App 29, 33; 480 NW2d 590 (1991). "An agency relationship may arise when there is a manifestation by the principal that the agent may act on his account." *Meretta v Peach*, 195 Mich App 695, 697; 491 NW2d 278 (2002). In determining whether an agency has been created, we take into consideration the relations of the parties as they exist under acts or agreements. *St Clair Intermediate Sch Dist v Intermediate Ed Ass'n/Mich Ed Ass'n*, 458 Mich 540, 557; 581 NW2d 707 (1998). An agency relationship can be created by express contract. *Breighner v Mich High Sch Athletic Ass'n, Inc*, 255 Mich App 567, 582-583; 662 NW2d 413 (2003). An employer is not liable for torts committed by an employee when the conduct falls beyond the scope of employment; an employee acts within the scope of employment when he or she is engaged in the service of the master or going about the master's business. *Hamed v Wayne Co*, 490 Mich 1, 11; 803 NW2d 237 (2011).

Here, there was a physician employment contract between Dr. Shanaver and the hospital applicable to the timeframe during which the alleged malpractice occurred. The contract generally encompassed preceptor (teaching) activities and duties performed by Dr. Shanaver in relation to residents and medical students. Section 1.4 of the contract provided, "Physician acknowledges that when treating patients at [the hospital's] facilities, he or she *is acting as an agent of* [the hospital], therefore, the patient relationship is with [the hospital]." (Emphasis added.) This language, if implicated, would clearly create an actual agency relationship between Dr. Shanaver and the hospital. The question becomes whether Dr. Shanaver's treatment of plaintiff fell within the scope of the contract, such that § 1.4 could be invoked by plaintiff, or whether there was a genuine issue of fact on the matter. The contract, as reflected in an incorporated exhibit, described Dr. Shanaver's duties as including the "[d]eliver[y] [of] the Manipulative Medicine curriculum through lectures, discussions, *consultations*, outpatient visits, organized self-study and pre- and post-tests." (Emphasis added.)

Plaintiff relies on the "consultations" term in arguing that the procedure performed on plaintiff by Dr. Shanaver fell within the scope of the contract. During Dr. Shanaver's deposition, she testified as follows:

I am listed as a consultant in osteopathic manipulative medicine, and I see patients at the request of attending physicians.

* * *

Well, the normal way that the consultations are done is that the attending physician writes an order, the ward clerk phones the consultant. And because Dr.

Lustic was not the attending for the baby [plaintiff], . . . the ward clerk and I asked permission by telephone from Dr. Chamberlain who was the attending physician for [plaintiff].

It is clear that Dr. Shanaver viewed "consultations" as including the actual treatment of patients, such as plaintiff, at the request of attending physicians. To the extent that one must go outside the four corners of the contract to ascertain whether "consultations" encompass the direct treatment of patients, or to determine whether there is an ambiguity or issue of fact on the matter, we note the Supreme Court's decision in *Shay v Aldrich*, 487 Mich 648; 790 NW2d 629 (2010). In examining the scope of rights under a release, the *Shay* Court observed that contracts are subject to the parol evidence rule, which precludes the use of extrinsic evidence when interpreting unambiguous contractual language, that ambiguous contracts open the door to the admission of extrinsic evidence to establish the actual intent of the parties, and that an ambiguity can be either patent or latent. *Id.* at 667. The Court further elaborated:

> This Court has held that extrinsic evidence may not be used to identify a patent ambiguity because a patent ambiguity appears from the face of the document. However, extrinsic evidence may be used to show that a latent ambiguity exists. . . . A latent ambiguity exists when the language in a contract appears to be clear and intelligible and suggests a single meaning, but other facts create the necessity for interpretation or a choice among two or more possible meanings. To verify the existence of a latent ambiguity, a court must examine the extrinsic evidence presented and determine if in fact that evidence supports an argument that the contract language at issue, under the circumstances of its formation, is susceptible to more than one interpretation. Then, if a latent ambiguity is found to exist, a court must examine the extrinsic evidence again to ascertain the meaning of the contract language at issue. [*Id.* at 667-668 (citations and quotation marks omitted).]

The *Shay* Court proceeded to indicate that it was necessary to consider whether a latent ambiguity arose from undisputed extrinsic evidence presented by one of the parties. *Id.* at 671-672.

In the instant case, if not patent, there is at least a latent ambiguity, given Dr. Shanaver's deposition testimony, concerning whether the term "consultations," as contained and used in the contract, extended to the treatment of patients.

Our conclusion, however, does not end the inquiry, as we must also examine the context in which the term "consultations" was used, where Dr. Shanaver, as quoted earlier, was to employ "consultations" in the "[d]eliver[y] [of] the Manipulative Medicine curriculum." There is no indication in the record that residents were involved or present with respect to the procedure at issue; there is no evidence showing that Dr. Shanaver was engaged in precepting, teaching, or delivering curriculum when she performed the procedure on plaintiff. That said, the contract, in an exhibit incorporated into the contract, provided that "[t]his Agreement is based upon the understanding that 100% of Physician's time spent performing Services shall constitute teaching activities." And in Dr. Shanaver's affidavit, she averred that "consultations are one of the modes by which teaching is done[,]" that "there is an 'open invitation' to all lecture

participants to observe any consultations[,]" and that "providing lectures and doing consultations are two of the modes by which the Manipulative Medicine curriculum is delivered[.]" The contract provision and these averments, when viewed in a light most favorable to plaintiff, can reasonably be construed to indicate that any time Dr. Shanaver treated patients in the hospital as part of performing consultations, she was simultaneously wearing the hat of a preceptor or teacher under the contract, with the consultations being open for observance by residents, medical students, or other interested doctors as an educational tool. Although perhaps no one was in attendance at the particular time Dr. Shanaver performed the procedure on plaintiff, the evidence could lead a reasonable person to conclude that there was an "open invitation" for viewing the procedure and that the procedure, i.e., the consultation, was thus covered by the contract, including the agency provision in § 1.4. Minimally, a latent ambiguity exists on the matter.

In sum, we hold that there exists a genuine issue of material fact regarding whether Dr. Shanaver was an actual agent of the hospital under the contract for purposes of the procedure performed on plaintiff. Accordingly, the trial court erred in granting summary disposition in favor of the hospital on the claim of vicarious liability.[1]

We do find it necessary to respond to some of the criticisms voiced by our dissenting colleague. The dissent states:

> In her sworn deposition testimony, Dr. Shanaver made it abundantly clear that she did not act under her preceptor contract when she treated plaintiff, but instead simply performed as an independent contractor physician with on-call privileges who treated her patient, at the request of the patient's mother's doctor. . . . In her unrebutted sworn testimony, Dr. Shanaver said that she did not see plaintiff under her preceptor contract when she treated plaintiff.

The deposition testimony of Dr. Shanaver upon which the dissent is apparently relying was as follows:

> *Q.* [D]id you have an arrangement with the hospital that you were available for the physicians on staff for patients who were born in the hospital?
>
> * * *
>
> *A.* That is one of my privileges is to provide consultation and osteopathic manipulative treatment for inpatients at [the hospital].

---

[1] We also rule that the trial court did not err with respect to the question of ostensible agency, where there was simply a lack of evidence sufficient to create a genuine issue of material fact showing that the hospital, through some act or neglect, generated a belief by plaintiff's mother that Dr. Shanaver was acting as an agent of the hospital at the time of the procedure. *Chapa,* 192 Mich App at 33-34.

-5-

*Q*. And that was the role in which you provided services in this case?

*A*. Yes, sir.

*Q*. And that was in furtherance of your – do you have a contract with the hospital?

*A*. No, sir.

As reflected in this testimony and contrary to the dissent's contention, Dr. Shanaver did not testify that she did not treat plaintiff under the preceptor contract; rather, she merely stated that she had no contract with the hospital at the time of her deposition. Moreover, even if Dr. Shanaver did not believe that she was performing services under the preceptor contract when she treated plaintiff, such belief does not establish as a matter of law that the contract was not implicated or triggered. Indeed, the dissent observes that if Dr. Shanaver "taught while simultaneously treating patients, then the contract itself provides that the patient is a patient of the hospital, not Dr. Shanaver, and thus the hospital would be directly liable for any medical malpractice by Dr. Shanaver." Accordingly, the dissent's stance ultimately boils down to the lack of evidence showing that any teaching was taking place during plaintiff's particular procedure. Had a resident indisputably popped in to observe some of the procedure, the dissent, ostensibly, would grant summary disposition in favor of plaintiff.

The dissent discounts the language in the contract which provided that "[t]his Agreement is based upon the understanding that 100% of Physician's time spent performing Services shall constitute teaching activities." The dissent's view, essentially, is that Dr. Shanaver was not providing services under the contract when she performed the procedure on plaintiff, as "there is no dispute that no teaching or delivery of curriculum occurred during the consultation at issue." This view is perhaps correct depending on how one construes the quoted contract provision, but the provision is ultimately ambiguous when read in context with the entire contract and the attached exhibits and is susceptible to a reasonable alternative interpretation. Delivering curriculum is necessarily a teaching activity, so it would be redundant to state that 100% of a doctor's time spent delivering curriculum shall constitute teaching activities. Thus, the reference to performing services could be construed as pertaining to the consultations themselves, rendering all consultations, at least in part, a teaching activity. Moreover, the dissent selectively ignores and disregards Dr. Shanaver's affidavit, in which she averred, as noted earlier, that "consultations are one of the modes by which teaching is done[,]" that "there is an 'open invitation' to all lecture participants to observe any consultations[,]" and that "providing lectures and doing consultations are two of the modes by which the Manipulative Medicine curriculum is delivered[.]" The dissent effectively forecloses on the possibility that the mere opportunity for or invitation to residents or students to observe a consultation implicates § 1.4 of the contract. The contract can reasonably be interpreted as simply reflecting an intent by the hospital to seek and obtain *accessibility* for residents and students to observe medical procedures, with Dr. Shanaver agreeing to allow access to her consultations for educational purposes.

-6-

The dissent finds our approach "highly questionable" and accuses us of ruling in a manner that is inconsistent with the facts and the law in order to obtain a "desired result." We have not held that the hospital is vicariously liable, but only that an issue of fact exists on the question relative to the contract. It is the dissent that has concluded as a matter of law that the hospital is not vicariously liable, construing contractual ambiguities and resolving issues of fact in favor of the hospital, mischaracterizing deposition testimony, and ignoring Dr. Shanaver's affidavit.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction. Having fully prevailed on appeal, plaintiff is awarded taxable costs pursuant to MCR 7.219.

/s/ William B. Murphy
/s/ Stephen L. Borrello